[No. 3893.]

STANDLEY ET AL. v. THE HENDRIE & BOLTHOFF MANU-
FACTURING CO. ET AL.

CORPORATIONS—INSOLVENT MINING COMPANY—RECEIVERS—LIENS.

Under section 497, Mills' Ann. Stats., authorizing courts of equity to
dissolve and close up insolvent corporations and to appoint a re-
ceiver therefor, the court has no power through a receiver appointed
for an insolvent mining corporation to operate the mines of the
insolvent company and to make the expenses created thereby a
first and paramount lien on the property of the corporation supe-
rior to existing liens. The court may authorize the creation of an
indebtedness and make the same a first lien for the purpose of pay-
ing the necessary expenses of the care and custody and the realiza-
tion and preservation of the property of the corporation, but for
no other purpose.

*Appeal from the District Court of Arapahoe County.*

ON August 7, 1897, the Hendrie & Bolthoff Manufactur-
ing Company and A. C. Schlesinger filed a complaint in the
district court of Arapahoe county against the Crown Point
& Virginia Gold Mining Company, wherein it is alleged that
they were judgment creditors of the company; and also that
the appellants had theretofore recovered judgment against
the company, transcripts of which respective judgments were
duly recorded in the office of the recorder of Clear Creek
county, Colorado; that the company had made no defense to
any of the actions in which said judgments were rendered;
that some of the judgments are false and fraudulent as
against the creditors of the company, and that the company
had collusively and without consideration permitted them to
be rendered against it for the purpose of defrauding certain
of its stockholders who were in the minority and the other
creditors of the company; that the management and control
of the stock and concerns of the company were in the hands
of George A. Kessler and George Semel, both nonresidents of
the state of Colorado, who were fraudulently and recklessly

managing its affairs and business operations for the purpose
of wrecking the company; that none of said judgments have
been paid by the company, or any one for it, and that it is
making no effort to pay the same, but is allowing its property
to be seized and sold by some of said judgment creditors, and is
making no effort to redeem its property from such sale; that
the mining properties of the company were valuable if prop-
erly managed and worked, and that sufficient money could be
obtained through the extraction of ore therefrom to pay all of
its just debts; that an execution had been issued upon a cer-
tain judgment obtained by Benjamin F. Lowell and others;
that a demand had been made by the sheriff of Gilpin county
upon the company to pay the money due upon the execution
issued upon said judgment; that the company had allowed
said judgment to remain unsatisfied for ten days after such
demand, by reason of which the sheriff had levied said exe-
cution upon the mining property of the company, and a valu-
able part of said mining property was, on February 15, 1897,
sold at sheriff's sale to satisfy the judgment, and that the
time for the redemption from such sale would expire on Au-
gust 15, 1897. It is also alleged that the meetings of the
directors of the company had all been held outside of the
state of Colorado, and in the city of New York, without any
notice to S. A. Josephi, the only resident director of said
corporation; that said corporation as managed is, and will
be, entirely insolvent; prayed judgment in behalf of them-
selves and all others similarly situated; the appointment of
a receiver with the usual powers and duties, and with the
usual directions to take into possession and sequestrate the
property and effects of the company, convert the same into
money, for the use of the creditors, and that the corporation
be dissolved and its business closed up, according to the stat-
ute in such case made and provided. Neither the appellants,
although alleged to be judgment creditors of the company,
nor the directors charged with fraud and mismanagement of
the company's affairs, were made defendants to the suit.
S. A. Josephi, the resident director of the company, acknowl-

edged service of summons in the case on August 2, 1897. On the day the complaint was filed a petition in intervention, by Samuel Hyman and Jonas Hiller was also filed, containing similar allegations to those of the complaint. On the same day Josephi was appointed receiver. On August 13, 1897, a petition for his removal, setting forth several grounds therefor, was filed by the company. On August 19, 1897, the appellants, with the exception of Mayhew, filed a petition in intervention, asking to be permitted to become parties defendant for the purpose of resisting the application for receiver, and to protect their rights in the property involved, wherein they allege in substance, that they were mortgage creditors of the defendant company, who had foreclosed their mortgages and sold the property under decrees of foreclosure, and held certificates therefor; that the judgment mentioned in paragraph eight of the complaint was obtained in an action to foreclose a first mortgage on the east 750 feet of the Crown Point and Virginia claims, which had been given to secure a portion of the purchase price thereof; that a decree of foreclosure in the district court of the first judicial district of Colorado, in and for the county of Clear Creek, had been duly entered on May 25, 1897, making the same a first lien upon said premises, under which decree the same had been sold on July 12, 1897, and purchased by appellant Standley, as trustee, one of the creditors therein, who held a certificate of purchase therefor, duly recorded in the office of the recorder of Clear Creek county; that the judgment recovered by Thomas H. Potter and Edward W. Williams on May 25, 1897, was obtained by foreclosure of a first mortgage on the west 750 feet of the Crown Point claims, under which decree the property was sold on June 20, 1897, and purchased by Potter and Williams, who held a certificate of purchase duly recorded; that the judgment in favor of Thomas H. Potter and the Hawley Merchandise Company was obtained on May 25, 1897, in an action for the foreclosure of a first mortgage upon the property of said defendant, known as the Bantala lode mining

claim, and was also given to secure the purchase price of said property, under which decree the same had been sold June 28, 1897, and purchased by them, a certificate of purchase made and delivered to them, and duly recorded; that neither of said judgments have been paid.

It is further alleged that the receiver, Josephi, had been the sole manager of defendant company's affairs until about January 1, 1896, during which time all the debts mentioned in the complaint had been created; that he was wholly unacquainted with mines or their management, and incompetent to take charge of the workings thereof.

It was also charged, on information and belief, that the suit was collusive, and brought to procure the appointment of Josephi as receiver; and that the mining of the ore now developed in said mines under the receivership would constitute a waste and destruction of the property itself and of all that was of any value therein. The petition was granted, and petitioners made parties defendant.

On September 6, 1897, Josephi was removed and Michael Spangler appointed receiver. On December 4, 1897, Mr. Spangler met with a fatal accident, and died a few days thereafter. On December 23, 1897, A. B. McGaffey was appointed as his successor. On January 20, 1898, he filed his first report, wherein he showed that debts had been contracted under Spangler's administration to the amount of over $5,000, and filed a petition for authority to issue certificates of indebtedness to provide funds with which to meet these obligations and future charges for the preservation of the property, and that the same be made a lien upon the property; and alleged that if money was not raised the men then on the property would quit work, the mines would be filled with water, and almost, if not quite, destroyed; that mechanics' liens would be placed upon the property; and that it was probable, if the men were not paid, they might become desperate and destroy or damage the property; that the property had been sold for taxes, and there was then due for taxes $787.20; that to enable him to meet the obli-

gations incurred and to be incurred, provision should be made for the issuance of certificates in amount not exceeding $6,500.

To this petition these intervenors appeared, and resisted the application.   On January 20, 1898, Frank Mahew filed his answer to the petition, alleging that on October 12, 1896, Benjamin F. Lowell and Eugene Clark, copartners under the firm name of Lowell & Clark, recovered a judgment in the county court of Gilpin county, Colorado, against the defendant company, for $1,988.84 and costs; and on October 13, 1896, filed a certified transcript of said judgment in the office of the clerk and recorder of Clear Creek county.   On January 14, 1897, they caused an execution to issue on said judgment; that thereafter, and on January 19, 1897, the sheriff of Clear Creek county, under said execution, levied upon the following described property of the Crown Point & Virginia Gold Mining Company, to wit, the Williams, the Knickerbocker, the Hauchhaus, and the Sam Lee lode mining claims; and on February 15, 1897, in and by virtue of said execution and levy, the sheriff duly sold the property to Lowell and Clark, for the sum of $2,085.35, and issued to them a certificate of purchase.   On December 22, 1896, he, Mahew, duly recovered a judgment in the district court of the first judicial district of Colorado, in and for Clear Creek county, against defendant company, for the sum of $5,718.28 and costs; and caused a certified transcript of said judgment to be recorded in the office of the clerk and recorder of said county.   After the expiration of six months, and before the expiration of nine months from the sale under the Lowell & Clark judgment, to wit, on August 17, 1897, as such judgment creditor, he redeemed the premises sold under the Lowell & Clark judgment, and after the expiration of sixty days thereafter, to wit, on November 13, 1897, received a sheriff's deed for said property; that no work was done on any of said claims after November 1, 1897, by the receiver, and that he did not have possession of any of said claims after that date; that it was not necessary at any time for said receiver to do any work

or anything whatever for the preservation of said claims ; and objected to the issuance of any receiver's certificates, to become a lien upon said premises.

Upon this application hearing was had, and on March 1, 1898, the court entered an order and decree, authorizing the receiver to issue certificates of indebtedness, commonly known as receiver's certificates, for the amount of the indebtedness theretofore incurred, amounting in the aggregate to $5,167.60, and for an additional sum of $1,000 to be used in the future preservation and protection of the property, to bear interest at the rate of eight per cent per annum, and be a lien upon all the property that went into the possession of the receiver on August 7, 1897, prior to and to have precedence over each and all of the mortgage claims, sheriff's deeds or judgment liens owned by the appellants. From this judgment and decree they prosecute this appeal.

Mr. J. McD. LIVESAY, Mr. ALVIN MARSH, Messrs. THOMAS, BRYANT & LEE and Mr. CHASE WITHROW, for appellants.

Mr. DANIEL E. PARKS and Mr. E. C. MILES, for appellees.

MR. JUSTICE GODDARD delivered the opinion of the court.

It will be observed that the original action, in which the order complained of was made, is in the nature of a creditor's bill, and was brought under section 497, Mills' Ann. Stats., wherein the appointment of a receiver is expressly authorized. The controlling question presented for our consideration, therefore, is whether the court below, in exercising the special jurisdiction conferred upon it by this statute, had authority through its receiver, to operate during the pendency of the suit, the mines and mining property of defendant corporation, and to provide for the payment of the expenses so incurred by the issuance of receiver's certificates that should become a first and paramount lien on the property in his hands. So

much of the statute as is pertinent to this inquiry reads as follows :

"Courts of equity shall have full power, on good cause shown, to dissolve or close up the business of any corporation, to appoint a receiver therefor, who shall have authority by the name of the receiver of such corporation (giving the name), to sue in all courts, and to do all things necessary to closing up its affairs as commanded by the decree of the court."

It is strenuously insisted by counsel for appellees that under and by virtue of this provision, the receiver being clothed with power to do all things necessary to close up the affairs of the company, as commanded by the decree of the court, and the court having determined that the doing of such work and the issuance of receiver's certificates in payment therefor was necessary to that end, its judgment is conclusive as to such necessity and the power of the receiver in the premises.

We do not think that such is the purport or intent of the statute, but that it contemplates only the doing of those things which are necessary to the closing up of the affairs of the insolvent corporation ; and that while, by the appointment of a receiver, he becomes *eo instanti* vested with the legal title and right of possession of all the property of the corporation, both real and personal, for the purpose of subjecting the same to the claims of its creditors, he has no power, nor can the court clothe him with the power, to continue or carry on the business of the corporation. In other words, the statute, while conferring upon courts of equity, power and authority they would not otherwise possess to decree the dissolution of a corporation at the suit of an individual, and to that end authorizes the taking charge of its property through a receiver for the purpose of closing up its affairs, it does not confer upon the court any other or greater powers in the administration of such trust than it can exercise in other cases where, in the exercise of its equity jurisdiction, it may appoint a receiver to administer the affairs of an insolvent private business corporation, during pending litigation. The well settled rule applicable in the latter class of cases, recognized and approved

by this court in the recent case of *The International Trust
Company v. The United Coal Company, ante,* p. 246, is that
a court of equity has not the power to authorize a receiver
to incur indebtedness for carrying on the business, and to make
the same a first and paramount lien upon the *corpus* of the
property in his hands; but only such expenses as are neces-
sary to its care and custody, and expenses of realization and
preservation which may be incurred under the order of the
court, can be so made a paramount lien.    Chief Justice Camp-
bell, who delivered the opinion of the court, after a thorough
and exhaustive review of all the cases upon this subject, said:

" After a careful consideration of all the authorities cited, we
are of opinion that, in administering the affairs of an ordi-
nary insolvent private business corporation for which a re-
ceiver has been appointed, a court of equity has not the power
to authorize the receiver to incur indebtedness for carrying
on the business and to make the same a first and paramount
lien upon the *corpus* of the property superior to that of prior
lien holders without their consent.   While it may, in a proper
action, and with the proper parties present, through the in-
strumentality of a receiver carry on the business of private
corporations or individuals temporarily, and incur obligations
therefor that may be made a paramount lien on the *corpus*
of the property, such obligations must have been contracted
for, and must relate strictly to, the preservation of the *status*
of the property at the time of the appointment of the receiver."

The facts disclosed in the case at bar emphasize the neces-
sity of strictly enforcing this wholesome and just rule.   At
the time the original action was instituted, the appellants had,
under decrees of foreclosure of their respective liens, pur-
chased the entire mining property of the company, and the
only interest which the company then had was an equity of
redemption; and at the time the receiver made his applica-
tion for leave to issue the certificates in question, on Janu-
ary 20, 1898, and consequently when the order and decree
complained of was made, the time for the redemption by the
defendant company from such sales had expired; and it had

no interest or title in the premises to which the liens sought to be created thereby could attach. And it also appears that the indebtedness for which the receiver was authorized to issue his certificates was not essential to the preservation of, but had been incurred in operating, the mine, against the protests and over the objections of appellants ; the $1,000 being for its future preservation, which under the condition of the title would be solely for the benefit of appellants themselves. In these circumstances the decree complained of was clearly unwarranted, and no reason exists upon which it can be upheld. It should therefore be reversed, and it is so ordered.

*Reversed.*